# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Docket No. 2:16-cr-169-NT |
| | ) |
| NOOR MOHAMED, | ) |
| | ) |
| Defendant. | ) |

## ORDER ON DEFENDANT'S MOTION TO SUPPRESS

Defendant Noor Mohamed is charged with possession of a firearm by a felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(e). This matter comes before me on Mohamed's motion to suppress or exclude gunshot residue ("**GSR**") evidence. (ECF No. 36.) I heard oral argument on Mohamed's motion on September 21, 2017. For the reasons set out below, I **DENY** the motion to suppress and **RESERVE RULING** on the motion to exclude until trial.

## BACKGROUND[1]

On November 10, 2016, officers from the Portland Police Department ("**Portland Police**") responded to reports that shots had been fired in downtown Portland. Based on eyewitness statements, the Portland Police detained Mohamed as a suspect in the incident. Mohamed was handcuffed, placed in the back of a police vehicle, and driven to the Portland Police station. Officers questioned Mohamed for nearly an hour in an interview room at the station. Mohamed was then escorted to another interview room where he was held for an additional fifteen minutes. Some of

---

[1] The facts set out below are drawn from the parties' submissions and are not in dispute.

the officers who interacted with Mohamed during his arrest and questioning were armed. At no point did the arresting officers place bags or gloves over Mohamed's hands to protect Mohamed's skin from exposure to GSR.

While other officers questioned Mohamed, a Portland Police evidence technician collected three spent shell casings from the scene of the shooting. That same evidence technician then returned to the station to test Mohamed for GSR. The evidence technician put on a set of nitrile gloves and then swabbed Mohamed's hands and face. The technician performed a rapid-result GSR test, which suggested that GSR was present on Mohamed's skin. The Portland Police later sent Mohamed's swabs to a third-party laboratory, the RJ Lee Group, for further analysis, and the lab confirmed that Mohamed's swabs tested positive for the presence of GSR.

## SUPPRESSION OF EVIDENCE ON DUE PROCESS GROUNDS

Mohamed has moved to suppress or to exclude from evidence the GSR swabs that the Portland Police took from him after his arrest and the results of any analysis of those swabs. Mohamed claims that the Portland Police did not take necessary steps to avoid exposing him to ambient GSR before taking the swabs. Mohamed argues that his GSR samples are therefore tainted, and that their admission would violate his 5th Amendment due process rights by exposing him to criminal liability on the basis of flawed evidence. After reviewing the record including the parties' expert reports, I decline the invitation to suppress the challenged evidence.

The Constitution "protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by

2

affording the defendant means to persuade the jury that the evidence should be discounted as unworthy of credit." *Perry v. New Hampshire*, 565 U.S. 228, 237 (2012). "Only when evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice,' " do courts "impose[] a constraint tied to the Due Process Clause." *Id.* (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)). The "category of infractions that violate 'fundamental fairness' " is highly circumscribed. *Dowling*, 493 U.S. at 352.

Mohamed insists that this is one of those rare cases. He suggests that the circumstances here are analogous to cases in which courts have suppressed witness identifications that police elicited using suggestive lineups or photo arrays. *See Perry*, 565 U.S. at 237-40 (reviewing identification cases). As there, Mohamed argues, his positive GSR test was the result of police officers' misconduct rather than a reliable reflection of reality.

This analogy does not help Mohamed. Witness identifications are suppressed "only in extraordinary cases." *United States v. Holliday*, 457 F.3d 121, 125 (1st Cir. 2006). "An out-of-court identification based on a photo array must be suppressed as a matter of due process 'only if the photographic identification procedure was so impermissibly suggestive as to give rise to a *very substantial likelihood of misidentification.*' " *Id.* (emphasis added). There has been no comparable showing here. Mohamed has presented evidence that suggests (1) that GSR *can* be transferred from a person's custodial environment to their skin; and (2) that Mohamed was exposed to several *potential* sources of GSR—including the officers who arrested,

3

questioned, and swabbed him, the police vehicle in which he was transported to the station, and the interview rooms in which he was held. Mohamed has not, however, provided evidence that there is a very substantial likelihood that GSR from his custodial environment was transferred to his skin. *See id.*

Mohamed's own evidence cuts against him on this point. Mohamed and his expert (Greg Danas of G&G Firearms Experts) principally rely on a paper that memorializes the FBI Laboratory's 2005 Gunshot Residue Symposium (the "**Symposium Paper**"), a gathering of experts in the field of GSR analysis. Def.'s Ex. 3 (ECF 36-3). The Symposium Paper makes clear that the attending experts could not speak to the likelihood that a suspect would pick up GSR from their custodial environment. For example, the Symposium Paper suggests that "GSR is in the environment of patrol car backseats" and states that a majority of the Symposium's attendees "agreed that it is possible for a handcuffed person's hands to be contaminated by the prior presence of GSR in the backseat of a police vehicle." Symposium Paper at 5. But the paper also states that "if asked in court how likely it is for a handcuffed person's hands to be contaminated in the backseat of a police vehicle, most GSR experts would answer 'I don't know.'" Symposium Paper at 5. Likewise while the Symposium Paper mentions a study that found that tables in interrogation rooms "revealed a much higher rate of transferred [GSR]" than law enforcement vehicles, it also states that the "chance of secondary transfer to subjects

. . . was *relatively low* based on the collected data." Symposium Paper at 6.[2] And while Danas's expert report and the Symposium Paper both say that the best practice is for officers either to test a suspect for GSR at the scene of the arrest or to bag the suspect's hands until testing, no evidence has been presented that failure to do so necessarily or even very likely compromises the resulting sample. Moreover Danas admits that "there are still many municipalities that do not take a protective stance in combating the inadvertent and unnecessary transference of GSR particles." Def's Ex. 4 at 6 (ECF 36-4).

The unquantified—and potentially "low"—possibility that Mohamed's hands may have been contaminated with GSR does not rise to the level of fundamental unfairness. This uncertainty that Portland Police's actions affected Mohamed's sample at all differentiates this case from the photo array cases on which Mohamed relies. For example, a photo array that includes just one individual who matches a witness's prior description creates a much greater likelihood that the witness will identify that individual instead of any other. *See United States v. Constant*, No. 2:12-cr-65-NT, 2013 WL 441175, at *9 (D. Me. Feb. 5, 2013) (identification suppressed where only one of six photos presented to the witness had the long dreadlocks and white tank top that the witness had recounted seeing on a suspect, and where the witness indicated that he had only picked the defendant out of the photo array because he did not want to be "bad"). Moreover while Mohamed suggested at oral

---

[2]   These statements from the Symposium Paper—which both Mohamed and Danas look to as a definitive resource—undermine Danas's unsupported statement that there was an "overwhelming likelihood of transference in this case." Def's Ex. 4 at 6 (ECF 36-4).

5

argument that the Portland Police willfully fabricated his GSR evidence, from the facts presented in the record I do not find this to be a willful fabrication. Police departments would do well to adopt the best practices for GSR collection outlined in the Symposium Paper in order to avoid any risk of contamination. However, there was no evidence presented that the Portland Police were even aware of the Symposium Paper. I find that the Portland Police officers' actions are not the sort of police conduct that would support application of the exclusionary rule.[3]

## CONCLUSION

For the reasons stated above, Defendant's motion is **DENIED** in part and **RESERVED** in part.

SO ORDERED.

/s/ Nancy Torresen

---

[3] Mohamed's motion also argued that the GSR evidence should be excluded under Rule 702 of the Federal Rules of Evidence, which addresses the admissibility of expert testimony. Fed. R. Evid. 702. Mohamed's motion papers exclusively criticize the Portland Police's actions—not the qualifications of or the analysis performed by the Government's experts. Such collection issues generally "go to the weight of the [GSR] evidence, not its admissibility." *United States v. Stafford*, 721 F.3d 380, 395 (6th Cir. 2013); *see also Crowe v. Marchand*, 506 F.3d 13, 18 (1st Cir. 2007) ("Objections . . . which question the factual underpinnings of an expert's investigation, often go to the weight of the proffered testimony, not to its admissibility."); *United States v. Lee*, 502 F.3d 691, 698 (7th Cir. 2007); *United States v. Eldridge*, No. 09-CR-329, 2013 WL 6096520, at *7-8 (W.D.N.Y. Nov. 20, 2013); *United States v. Pearsall*, 492 F. Supp. 2d 432, 435, 439 (D. Del. 2007). However, Mohamed finds some support in a line of state cases that have held that failure to follow manufacturers' protocols in the collection and testing of blood and breath samples degrades the reliability of the test and destroys the foundation necessary for admission of the evidence. *See Hunter v. State*, 55 A.3d 360, 365-66 (Del. 2012) ("Following the manufacturer's use requirements ensures the reliability of the scientific test. It is this guarantee of reliability and accuracy that is the foundational cornerstone to the admissibility of the results of a scientific test. Without that guarantee of reliability, there exists too great a risk that a jury will be persuaded by scientific evidence that is unreliable."); *Clawson v. State*, 867 A.2d 187, 192 (Del. 2005); *State v. Fountain*, No. 1411013133, 2016 WL 4542741, at *9 (Del. Super. Ct. Aug. 30, 2016).

I agree with Mohamed's statement at oral argument that I need not rule on the Rule 702 admissibility of the RJ Lee Group's testimony at this time. Mohamed may challenge the admissibility of that expert testimony at trial if he finds he has appropriate grounds to do so then.

United States Chief District Judge

Dated this 3rd day of October, 2017.